**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION**

| | | |
|---|---|---|
| **WILLIAM F. UECKERT, JR.,** | § | |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | **C.A. NO. 7:18-CV-00302** |
| | § | |
| **CITY OF PHARR, TEXAS,** | § | |
| **JUAN G. GUERRA, AND ED WYLIE** | § | |
| **Defendants** | § | |

**DEFENDANT CITY OF PHARR'S
MOTION FOR SUMMARY JUDGMENT**

_____

MAY IT PLEASE THE COURT:

NOW COMES DEFENDANT CITY OF PHARR TEXAS (hereafter "DEFENDANT" or "CITY") and files this Motion for Summary Judgment as to Plaintiff's Second Amended Complaint (hereafter "Complaint") pursuant to Federal Rules of Civil Procedure 56 as both a traditional and no evidence summary judgment.

### I. Nature of the Lawsuit/Discovery Status

Plaintiff is a former City employee of the City of Pharr, having served as the City Engineer. Plaintiff alleges that his employment was unlawfully separated in retaliation for alleged First Amendment speech. Plaintiff brings First Amendment claims against the City and the City Manager and Assistant City Manager.

Plaintiff alleges that he was terminated for refusing to sign a right-of-way (ROW) and utility certifications related to a City engineering project. *Dkt. 18.* Plaintiff alleges that that he "protested" to a City engineering consultant in a Friday September 16, 2016 meeting that he could not sign specific engineering documents/certifications and made this same "protest" to the City Manager and Assistant City Manager the following Monday, because they contained misrepresentations. Plaintiff alleges that he was ordered to sign the certifications, refused, and that the "compelled speech" of having been ordered to sign the engineering plans constitutes protected First Amendment speech. Written discovery and depositions have taken place in this case and the discovery deadline has passed.

## II. Exhibits in Support of Motion for Summary Judgment

Defendant hereby submits in support of this dispositive motion a set of authenticated and admissible exhibits, which are incorporated by reference for all purposes[1]:

1. Plaintiff's Deposition Testimony with exhibits

2. Ed Wylie's deposition testimony with exhibits

3. Witness Griselda Saldivar's deposition testimony with exhibits

4. Juan Guerra's deposition testimony with exhibits

5. Witness Joe Torres' deposition testimony with exhibits

6. Defendant Juan Guerra declaration

7. Defendant Ed Wylie declaration with attached documents

8. Plaintiff's job description

9. September 7 TexDot email with attachments

10. September 16 email from Plaintiff to engineers TEDSI

11. Witness Joe Torres statement regarding meeting with Plaintiff

12. Joe Torres September 18 email to Guerra

13. Plaintiff September 19 email to Ed Wylie

14. De Leon & Ybarra lawsuit documents

## III. Factual Background

Plaintiff was the former City Engineer for the City of Pharr. *Dkt. 18*. Prior to his employment with Pharr, Plaintiff had served as a civil engineer for a variety of companies spanning over 30 years. *Ex. 1, p. 12:6-16:14*. Plaintiff was hired as the Pharr City Engineer in June 2010. *Ex. 1, p. 18:9-14*. Plaintiff was hired with the understanding he would be in charge of engineering projects. *Ex. 1, p. 20:4-16.* Plaintiff was a City employee, not a contractor. *Ex. 1, p. 22:4-10.* In his capacity as City Engineer, Plaintiff never had an issue about whether some aspect of his job constituted part of his job description or role as City Engineer. *Ex. 1, p. 23:21-24:10.* Plaintiff's position as City Engineer had a written job description, which Plaintiff agrees contains his job requirements and duties. *Ex. 1, p. 25:5-16; p. 26:12-25; p. 33:11-34:6 with depo Ex. 1; Exhibit 8.*

---

[1] These are filed as part of a separate summary judgment record to avoid excessive exhibit duplication filing. The exhibits to the summary judgment record are incorporated fully into this MSJ and those filed on behalf of the individual Defendants.

The Owassa Road engineering project ("the project") involved a roughly two-mile road reconstruction widening the 2-lane Owassa Road into a 4-lane road. *Ex. 1, p. 37:5-18*. The project involved relocating utilities for the re-construction. *Ex.1, p. 38:12-22*. The project was a TexDot project. *Ex. 1, p. 55:1-2*. Only twice before in his entire engineering career prior to the Owassa Road project had Plaintiff signed and certified right-of-way and utilities relocations on engineering projects. *Ex. 1, p. 43:15-p. 45:15*. The project started during Plaintiff's employment. *Ex. 1, p. 47:8-22*. Consulting engineers were hired by the City to assist with the project, including TEDSI and Joe Torres. *Ex. 1, p. 47:25-48:10*. Plaintiff was involved in reviewing the proposed scope of work contract and duties for consulting design engineer TEDSI on the project. *Ex.1, p. 48:15-51:21*. Plaintiff understood that his job duties included assisting TEDSI with regard to their scope of work on the project, including reviewing their designs and plans for accuracy. *Ex. 1, p. 52:1-5; p. 52:20-25*. Joe Torres was a consultant doing work for the City and Pharr Economic Development Corporation, and was not a Phar employee. *Ex. 4, p. 60:3-9; Ex. 5, p. 145:23-p. 146:9; p. 151:15-17*. With respect to consulting engineer Torres, Plaintiff did not have a firm understanding of his role other than to push the project. *Ex. 1, p. 53:1-4*.

As part of the project, Plaintiff signed letters regarding utility conflicts and relocation because that was his responsibility as City Engineer. *Ex. 1, p. 80:1-82:10; p. 84:3-16. with depo Ex. 6*. With regards to utility conflicts on the project, Plaintiff understood that was Plaintiff and TEDSI's responsibility, not Joe Torres' responsibility. *Ex. 1, p. 85:22-p. 86:16*. With respect to the project, TexDot would communicate comments to Plaintiff and TESDI, and he would pass them on to Joe Torres. *Ex. 1, p. 90:1-12*.

Plaintiff acknowledged that, even as of the time of his deposition, he had no idea if utility and right-of-way documents could be submitted for TexDot engineering projects indicating that those were not yet completed. *Ex. 1, p. 92:15-93:9*. Plaintiff also testified that there is no certification form indicating that utilities are still in conflict and that in his entire engineering career, he never saw such a certification or form. *Ex. 1, p. 101:4-p. 102:24*. Plaintiff testified that nobody from TexDot nor the City asked him to sign a utility certification identifying utilities still in conflict. *Ex. 1, p. 102:25-103:20*. Plaintiff testified he's never submitted a certificate of utilities conflict; never submitted any documentation to TexDot advising of still-ongoing utilities conflicts; and had never even heard of anyone submitting documentation to TexDot advising of still-ongoing utilities conflicts. *Ex. 1, p. 115:18-117:15*.

However, Plaintiff testified that there were "forms" that could be submitted to TexDot indicating that there were ongoing utility conflicts not yet cleared and estimating their clearance dates, but distinguished them from being "certifications". *Ex. 1, p. 118:1-125:12 with depo Ex. 11.* Despite such semantics distinctions (which in essence form the entire basis of his lawsuit), Plaintiff acknowledged that it would be his job as City Engineer to sign and submit documentation to TexDot indicating that utility conflicts were not yet clear and identifying the still-existing utility conflicts. *Ex. 1, p. 121:2-15.* Signing certifications on engineering projects would be the City Engineer's job. *Ex. 2*, *p. 80:8-p. 81:5; Ex. 8.*

As part of the project, on September 7, 2016, TexDot employee Griselda Saldivar forwarded an email to Plaintiff, Joe Torres and TEDSI advising them of, and attaching for their use, various certifications for right-of-way and utilities; and that certifications needed to be signed by a representative of the local government and submitted to TexDot. *Ex. 1, p. 128:2- p. 130:24 with depo Ex. 12; Ex. 3, p. 26:23-p. 34:21 with depo Ex. 3*; *Ex. 9.* Included within these various draft certifications TexDot advised Plaintiff could be submitted was a draft certification specifically advising that utilities were not all cleared and were still in conflict with proposed dates by which the conflicts would be cleared; and that rights of way were not yet all obtained and giving estimated dates for their competition. *Ex. 1, p. 128:2- p. 130:24 with depo Ex. 12; Ex. 3, p. 26:23-p. 34:21 with depo Ex. 3*; *Ex. 5, p. 154:9-164:3 with depo Ex. 12*; *Ex. 9.*

TexDot employee Saldivar is a professional engineer and was the TexDot project manager for the project. *Ex. 3, p. 7:2-p. 8:21; p. 9:14-p.13:1; p. 59:12-23.* Saldivar testified that TexDot would typically expect a City's engineer to sign and seal utility certifications if they were involved in the project. *Ex. 3, p. 17:16-p. 18:23 with depo Ex. 2.* Saldivar indicated that the utility certification required by TexDot on the project was basically an update on the status of utilities, which can vary from notification that all utilities are no longer in conflict, to a notification that utilities are still in conflict and estimated date of adjustment. *Ex. 3*, *p. 21:6-p. 26:2.* It was precisely these various types of certifications to cover all situations that Saldivar sent to the City, Plaintiff included, on September 7. *Ex. 3, p. 26:23-p. 34:21 with depo Ex. 3.* TexDot accepts these certifications in situations where utilities are not yet cleared and/or rights of way are not yet obtained. *Ex. 3.* Torres knew and understood this to be standard practice in the engineering field and expected an engineer like Plaintiff to know these certifications existed. *Ex. 5, p. 154:9-164:3; p. 187:15-21; p. 190:25-p. 191:21 with depo Ex. 12.*

Plaintiff saw and read the September 7 email with the attached *various* certifications that could be submitted, but did not do anything in response to the email or ask any questions about the various certifications TexDot attached and indicated could be submitted. *Ex. 1, p. 128:2-20; p. 129:8-p. 132:13; p. 156:23-p. 158:13 with depo Ex. 12.* Plaintiff was confused regarding specifically what was being requested in the September 7 email, both with regard to certifications, and not even understanding that the reference to LG meant "local government" and instead thinking it was a different engineering firm. *Ex. 1, p. 112:13-p. 115:11.* In response to this critical September 7 email on the project and certifications, Plaintiff did nothing; and the email itself didn't trigger anything in his mind that something had to be done regarding certifications, even though acknowledging submitting the documents/certifications was his job. *Ex. 1, p. 156:23-p. 158:13.*

On September 16, 2016, Plaintiff met with Joe Torres and Saldivar regarding the project. *Dkt. 18; Ex. 1, p. 132:14-p. 133:1; p. 144:18- p. 147:23 with depo Ex. 13; Ex. 5, p. 6:24-p. 68:23; p. 82:2-8.* At this meeting between the three of them, Saldivar mentioned needing utilities and rights of way certifications soon, but did not specify which specific version of each certification was needed (ie no specification regarding the certifications that said all conflicts resolved vs certifications identifying still-existing conflicts with proposed completion dates) and when she indicated she needed certifications, she was not asking for specific certifications indicating that utility and right of way conflicts had all been cleared already. *Ex. 3, p. 36:13-p. 38:18; Ex. 1, p. 148:12-21 with depo Ex. 13; Ex. 5, p. 101:2-12; p. 170:10-172:10; p. 174:12-p. 175:19 with depo Ex. 8; Ex. 11.* Further, in addition to not specifying which certification needed to be submitted (ie one that says all utilities have been cleared and rights of ways obtained), Saldivar did not hear Torres advise Plaintiff that this specific certification had to be submitted at that time. *Ex. 3, p. 131:18-p. 133:7; Ex. 11.* Saldivar never requested of anyone representing the City in the project that they could only submit those certifications representing that utilities were not in conflict and rights of way were fully complete and obtained. *Ex. 3, p. 134:14-135:2.*

Saldivar left the meeting and Plaintiff claims that at that time, engineering consultant Torres told him that he needed to sign certifications certifying that all rights of way had been acquired and utilities had been cleared. *Ex. 1, p. 132:14-143:22*; *p. 155:5-156:22.* Torres denies this. *Ex. 5, p. 82:9-p. 83:4.* Torres testified that Ueckert simply said he wasn't signing "utilities certifications" period, even though that was his job and that there was never any discussion of specific certification saying utilities were cleared and rights of way cleared or obtained. *Ex. 11*;

*Ex. 5, p. 94:17-p. 97:25; p. 108:6-p. 109:2; p. 110:8-22; p. 115:4-9; p. 170:10-p. 177:22; p. 181:5-p. 185:20 with depo Ex 8.*[2] Regardless, Plaintiff testified that Torres did not present him with or show him any actual specific forms/certifications that needed to be signed, confirmed by both Torres Saldivar who indicated there were no draft documents or certifications at the meeting. *Ex. 1, p. 150:22-151:7; Ex. 3, p. 115:10-12; p. 116:16-p. 117:7. Ex. 5, p. 83:5-15; p. 169:11-p. 170:9.* Plaintiff testified that with this alleged request, Torres did not give him a time-frame to sign and submit the certifications to TexDot; that he fully acknowledged and understood it was his job to sign and submit the certifications; and that Torres wasn't telling him to do anything that wasn't already part of his job. *Ex. 1, p. 140:9-141:16; p. 143:11-16.* Torres also understood this to be Ueckert's job. *Ex. 5, p. 164:11-p. 165:18.*

Despite there being alternative certification forms that TexDot had notified Plaintiff just one week before (on September 7) could be submitted in situations where rights of way had not yet been acquired and/or utilities had not yet been cleared, Plaintiff got up and walked out of the meeting; made absolutely no effort to discuss these alternative certifications with Torres *or anybody else* during the September 16 meeting or afterwards that day, instead deciding it was at the end of the day and he needed to go home for the weekend; and testifying he was not aware of such alternative forms.[3] *Ex. 1, p. 134:21-p. 156:22; p. 158:14-19 with depo Ex. 13; Ex. 5, p. 94:17-p. 97:25; p. 108:6-p. 109:2; p. 110:8-22; p. 115:4-9; p. 170:10-p. 177:22; p. 181:5-p. 185:20 with depo Ex 8.* Further, Plaintiff *never* sought advice from anyone within the City or ask anyone from TexDot about the appropriate certifications that could be submitted, instead negligently or purposefully operating under the incorrect assumption that the only certifications that could or needed to be submitted to TexDot were those saying all utility conflicts cleared; and all rights of way had been obtained and finished, despite the September 7 email stating the exact opposite.. *Ex.*

---

[2] This dispute between Torres and Plaintiff is relevant, but does not create a fact issue for purposes of summary judgment as shown below. Not signing utility certifications period because he didn't think it was his job vs not signing specific certifications he believed to be inaccurate-Neither is protected First Amendment speech, as explained later based on the undisputed facts, but the first doesn't even involve Plaintiff's claimed First Amendment speech; and the evidence overwhelmingly shows that what occurred was the first described incident. Further, Guerra, the decisionmaker, was never given any information as to the Plaintiff's alleged version of what took place in the meeting as shown later.

[3] Inconsistently however, Plaintiff testified that during the Owassa Road project, he himself reviewed documents on the internet for TexDot projects containing certifications for both federal and state projects that allowed for certification submittal of certifications indicating that utility clearance had not yet been completed and rights of way were not complete. *Ex. 1, p. 210:2-p. 216:21 with depo Ex. 17.*

*1, p. 198:4-25.*

Immediately after the September 16 Torres meeting (that Plaintiff testified took place at the end of the day), he sent an email at 10:49 am to TEDSI representatives specifically about that meeting (confirming the meeting was not at the end of the day), and importantly, in this email Plaintiff did not say a single thing about allegedly being asked to sign false or inaccurate certifications, much less specific certifications saying that all utilities had been moved out of conflict and that all rights of way had been obtained. *Ex. 10.* Despite this alleged instruction and demand which forms the entire basis of his lawsuit, immediately after this meeting Plaintiff's only issue with this meeting to TEDSI is the fact that signing certifications period should not be his job (despite unequivical testimony that it was his job). *Id.*

Also, that day on September 16, Torres contacted City Manager Guerra about the meeting with Plaintiff, who contacted Assistant City Manager Wylie to put Torres in touch with him. *Ex. 2, p. 82:22-p. 87:20 with depo Ex. 5.* Concerned about inappropriate conduct/temper by Plaintiff being reported by Torres, Torres was sked to put together a written statement about what occurred at the meeting. *Ex. 2, p. 97:5-10 with depo Ex. 5.* Torres then put together a statement that was ultimately submitted to Wylie. *Id*; *Ex. 11; Ex. 5, p. 85:6-13; p. 91:24-p. 92:12 with depo Ex. 8.*

Over that same weekend, with the same email he sent his memorandum report, Torres sent to Juan Guerra an email discussing the certifications; the urgency to get them to TexDot; that the Mayor could sign them (since Plaintiff apparently refused), and most importantly, specifically identifying the utility certifications as consisting of identifying that utility conflicts *still exist and the estimated date of their removal. Ex. 12; Ex. 5, p. 91:24-p. 92:12; p. 200:21-201:3.* There is absolutely no mention of signing certifications stating that all utility conflicts have been removed at that time. *Id.*

On the Monday (September 19) following the meeting with consultant Torres, Plaintiff met with Assistant City Manager Wylie, in which he discussed the previous Friday's meeting with Torres. *Ex. 1, p. 158:14-168:15; Ex. 7.* At this time, both ACM Wylie and CM Guerra were Plaintiff's supervisors. *Ex. 4, p. 17:8-21; Ex. 3, p. 18:3-6.* At this meeting with Wylie, Plaintiff claims he brought a form certification regarding utilities and rights of way that he himself downloaded from the internet as evidence of what he believed Torres asked him to sign, even though 1.)Torres never showed him this form/certifications *and* 2.) those forms/certifications were not among those specifically sent by TexDot to Plaintiff/Torres regarding forms/certifications

TexDot would accept for submittal. *Ex. 1, p. 160:24-166:12 with depo Exs. 14 v 12 (TexDot certifications)*. Plaintiff appears to have assumed that these were the only forms TexDot would accept and that Torres was referring to, even though neither Torres or TexDot ever said so or specifically referred to these forms (and in fact TexDot specifically said the opposite with the September 7 email). *Id.* Plaintiff didn't even give these random certification forms to Wylie at the meeting. *Ex. 1, p. 165:8-15; p. 166:7-12*. Further, the specific forms Plaintiff himself unilaterally downloaded that were never shown to him by TexDot or Torres; never sent to him by TexDot or Torres; or specifically told for him to sign by TexDot or Torres, say absolutely nothing about utility conflicts; *and* themselves have an option to certify/indicate that rights of way *are still not acquired*. *Ex. 1, p. 160:24-166:12 with depo Exs. 14 (p. 1-2).* Emphasis Added.

Further, at this meeting with Wylie, according to Plaintiff, he confirmed that Torres never specified the date or time-frame by which the certification(s) needed to be signed and submitted and Wylie never asked him when Torres advised by when they needed to be signed. *Ex. 1, p. 160:9-20*. Lastly, Plaintiff testified that Wylie never ordered him to sign these random draft documents he printed off and that he assumed Torres and/or TexDot needed. *Id; p. 206:8-p. 209:23.* Plaintiff testified he had another meeting with Wylie that day on the 19th in which Plaintiff said the same thing: he was not going to sign a document at that time that stated the rights of way had been acquired and all utility conflicts cleared (the made-up document he believes he was being asked to sign). *Ex.1, p. 168:172:23*. Again, at this second meeting with Wylie, Plaintiff testified that Wylie did not order him nor ask him to sign any specific certifications or forms. *Id; p. 206:8-p. 209:23.* According to Plaintiff, the only thing Wylie said in regards to this issue is we have to get the project moving. *Ex. 1, p. 170:19-p. 171:14; p. 209:4-17.* Plaintiff had no other conversations with anyone at the City regarding utility or right of way certifications and absolutely nobody from the City, including CM Guerra or ACM Wylie, ever demanded he sign incorrect ROW or utility certifications. *Ex. 1, p. 172:18:23; p. 206:8-p. 209:23.*

Plaintiff did however, on September 19, 2016, send Wylie an email in which he not only says absolutely nothing about being asked or required to sign "inaccurate" certifications stating all utility conflicts had been cleared and that all rights of way had been acquired, but actually forwarding to Wylie all of the proposed possible certifications previously sent by TexDot, including the certifications that he could have signed indicating rights of way and utility conflicts were *not yet clear*. *Ex. 13*.

Defendant City's Motion for Summary Judgment                                           Page 8

Assistant City Manager Wylie, in conjunction with an investigation into Torres' September 16 allegations of Plaintiff's "feisty" conduct, confirms a meeting with Plaintiff on Monday September 19. With respect to his encounters with Plaintiff that Monday September 19, ACM Wylie was unaware of or specifically shown any document Plaintiff was allegedly ordered to and refused to sign; and confirms Plaintiff's testimony that he (Wylie) never required or ordered Plaintiff to sign any document that he claims forms the basis of this lawsuit. *Ex. 3, p. 11:19-p. 13:10.* Wylie had no knowledge of any specific documents Plaintiff either refused to sign or was asked to sign. *Ex. 3, p. 53:3-54:3; p. 56:6-59:23; p. 69:14-p. 73:22; p. 76:5-11; p. 83:10-88:1; p. 109:9-11; p. 122:1-18. with depo Ex. 6; Ex. 7; see Ex. 1 cites above.*

According to Wylie, as a result of looking into Torres' allegations of Plaintiff's disrespectful conduct on Friday, Plaintiff himself became belligerent and insubordinate to Wylie on September 19; and bullied one of his own subordinate female engineers-in-training; and it was this insubordination and belligerent conduct on September 19 that formed the primary basis of Wylie's recommendation for Plaintiff's employment separation to the City Manager. *Ex. 3, p. 21:10-22:3; p. 23:21-p. 29:7; p. 31:8-19; p. 34:9-p. 37:11; p. 69:3-19; p 101:2-14; p 102:4-p. 103:11 with depo Ex. 3-6; Ex. 7.* Plaintiff's termination recommendation had nothing to do with an alleged refusal to sign a specific certification form. *Id.* With respect to Plaintiff's conduct on September 19, he conceded to insubordinate conduct; agreeing he confronted his supervisor Wylie about why he was speaking with other employees about him; felt he had a right to force Mr. Wylie to reveal to him other employees' complaints about him; and demanded to know from his subordinate employee Maria Rangel what she and his supervisor Wylie discussed. *Ex. 1, p. 183:6-p. 190:17.*

ACM Wylie put together a termination recommendation package to be forwarded among HR; City Attorney and employment decision-maker City Manager Guerra. *Ex. 7.* As a result, Plaintiff was called into a meeting later on September 19th in which he, Wylie, CM Juan Guerra; HR Director Anali Alaniz and City Attorney Patricia Rigney were present. *Ex. 1, p. 172:24-p. 173:23.* At this meeting, CM Guerra gave Plaintiff the option to resign or be terminated. *Ex. 1, p. 173:23-p. 175:11; Ex. 3, p. 49:6-p. 52:25; Ex. 6-7.* There was no other discussion; including no discussion of any specific Owassa Road project certifications regarding rights of way and/or utilities. *Ex. 1, p. 175:12-p. 176:10; p. 206:8-p. 209:23; Ex. 3, p. 49:6-p. 52:25.*

ACM Wylie would be involved in personnel issues and report to CM Guerra, but the City

Manager is the final decisionmaker for employment decisions in Pharr. *Ex. 4, p. 18:20-p. 19:4*; *p. 20:13-p. 21:15*. City Manager Juan Guerra made the decision to separate Plaintiff's employment. *Ex. 6-7*. City Manager Guerra's decision to separate Plaintiff's employment was based solely on the recommendation of Assistant City Manager Wylie for reasons identified by Wylie in the termination packet. *Ex. 6-7*. None of the reasons in the memorandum to Guerra regarding Plaintiff's employment separation involved alleged First Amendment activity or First Amendment retaliation. *Id*. City Manager Guerra relied solely on ACM Wylie's recommendations and made the final decision to separate Plaintiff's employment by giving him the option to resign or be terminated. *Id*. Plaintiff never discussed certifications with Guerra; never brought it up to him; and Guerra never demanded Plaintiff sign any certifications. *Ex. 1, p. 205:12-20; p. 209:18-23.* Further, Wylie never demanded Plaintiff sign any certifications. *Ex. 1, p. 206:16-p. 209:17*. This is consistent with Wylie's testimony that he never forced Plaintiff to sign certification documents and doesn't know what documents Plaintiff is referring to. *Ex. 3, p. 12:1-p. 13:10.*

Later, in October 2016, certifications for rights of way and utilities were submitted to TexDot, in accordance with TexDot requirements, accepted by TexDot, indicating that rights of way had not yet been obtained and utilities had not yet been cleared. *Ex. 1, p. 190:25-p. 193:3 with depo Ex. 16; Ex. 2, p. 45:18-p. 49:14 with depo Ex 5.* These same certifications were signed by the TexDot district engineer. *Ex. 2, p. 51:10-p. 53:4*. Later, the City submitted additional certifications, again still identifying existing utility conflicts and rights of way not complete, that were acceptable to TexDot. *Ex. 2, p. 53:5-p. 56:1 with depo Ex. 7; Ex. 5, p. 57:10-p. 59:20; p. 193:20-p. 194:24 with depo Ex. 6.*

#### IV. Grounds for Summary Judgment

Defendant moves for summary judgment on the following grounds:

1.  Plaintiff has no evidence to establish that he made First Amendment protected speech or that he was the victim of First Amendment-causal retaliation

2.  Competent summary judgment evidence defeats Plaintiff's claims as a matter of law in that establishes that Plaintiff did not make First Amendment protected speech and that Plaintiff's employment was separated for non-retaliatory legitimate performance related issues.

3.  Plaintiff cannot establish a Section 1983 *Monell* claim against the City as a matter of law

## V. Summary Judgment Standard

Summary judgment is appropriate if the pleadings and affidavits and discovery on file "show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."   Rule 56(c), Fed.R.Civ.P.; *see also Celotex Corp. vs. Catrett*, 477 U.S. 317, 322 (1986).   The plain language of FRCP 56(c) mandates the entry of a summary judgment against a party "who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.   "Moreover, the nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in *any* case 'where the critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'" *Little*, 37 F.3d at 1075 (quoting *Armstrong vs. City of Dallas*, 997 F.2d 62 (5th Cir. 1993)).

Defendant urges this Motion as both a traditional motion for summary judgment and also urges a no-evidence motion as to each of the Plaintiff's claims.

## VI. Summary of the Argument

Plaintiff has no evidence to establish his First Amendment claim as he has no evidence that he made First Amendment protected speech and no evidence of causal retaliation for any alleged First Amendment protected speech. Plaintiff has no evidence to establish his First Amendment constitutional rights were violated pursuant to a policy, practice or custom of the City of Pharr.

The competent summary judgment evidence establishes that Plaintiff did not make protected First Amendment speech, but "spoke" or "did not" speak solely in regards to his job as City Engineer; Plaintiff never actually engaged in First Amendment speech in regards to certifications but instead simply relied upon an incorrect assumption about his alleged First Amendment rights; and the evidence shows Plaintiff's employment was separated for non-retaliatory legitimate performance related issues.

## VII. Argument & Authorities

**A. Plaintiff cannot show he made First Amendment protected speech as a matter of law**

### 1. Plaintiff never engaged in First Amendment speech; his alleged Speech not protected-Not Matter of Public Concern; spoke as employee

Plaintiff brings a claim for First Amendment speech retaliation. To establish a violation of his First Amendment right of freedom of speech, public employees like Plaintiff[4] must plead and establish that: (1) he suffered an adverse employment action, (2) he was not speaking pursuant to his official job duties, (3) his speech was as a citizen on a matter of public concern, (4) his interest in speaking outweighed the governmental defendant's interest in promoting efficiency, and (5) the protected speech substantially motivated the adverse employment action. *Salge v. Edna Indep. Sch. Dist.,* 411 F.3d 178, 184–86 (5th Cir.2005); *Davis v. McKinney,* 518 F.3d 304, 312 (5th Cir.2008) (discussing *Garcetti v. Ceballos,* 547 U.S. 410, (2006)); *Kinney v. Weaver*, 367 F.3d 337, 356 (5th Cir. 2004, *en banc*) (citing *Lukan v. N. Forest ISD*, 183 F.3d 342, 346 (5th Cir. 1999)). A governmental entity's "interests as an employer in regulating the speech of its employees 'differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" *Connick v. Myers*, 461 U.S. 138, 140, (1983) (quoting *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 568 (1968).

As the evidence shows clearly, Plaintiff didn't engage in First Amendment speech at all. He didn't oppose signing inaccurate or false certifications. That was never an issue. What he actually did was simply refuse to sign any certifications because he didn't think it was his job. The evidence shows it wasn't about the accuracy or inaccuracy of specific certifications-Plaintiff simply didn't want to sign certifications *period*. Regardless, even if Plaintiff could create a fact issue on that and show that he refused to sign a specific "inaccurate certification", his claim fails because it was not First Amendment speech, but "speech" in his job as City Engineer; it was not "speech" on a matter of public concern; and his interest in "speaking" did not outweigh the City's interest in promoting efficiency.

The Plaintiff has no evidence to establish his claim and the competent summary judgment evidence defeats Plaintiff's claim as a matter of law. The First Amendment "speech" Plaintiff claims he made is the allegation that he "told" a City engineering contractor Joe Torres; and then

---

[4] There is no doubt Plaintiff pleads and alleges that he was a public employee who "is the former city engineer for the City of Pharr…He was employed with the City for approximately six years…" *See Dkt. 18.*

Assistant City Manager Wylie, on September 16 and September 19, that he could not sign a right of way certification stating rights of way had been obtained; and a utility certification stating that all utilities had been cleared, when those things had not yet happened, because he believed such certifications would necessarily contain misrepresentations and that signing them would be unethical and a violation of law; and then refused to sign "such certifications"; and thus "spoke" by "refusing to sign". *Dkt. 18; Ex. 1, p. 217:12-18.*

The claim fails as a matter of law for several reasons. First, signing off on rights of way and utility certifications; *or* not signing off on them due to inaccuracies; and instead signing a different certification that would be accurate, was unquestionably one of Plaintiff's job duties. Plaintiff pays lip service to the nature of the "speech" in a half-hearted attempt to bring such a thing within the protection of the First Amendment by claiming that the speech at issue was the illegality of signing the certifications because misrepresentation of public actions, illegal activity, and official malfeasance are matters of public concern and because it is not within his job description as Engineer to sign and/or certify plans and/or documents containing misrepresentations. *Dkt. 18.* This type of characterization would nullify the job duties of every municipal employee in America and essentially make protected speech every municipal's worker's commenting on the accuracy of their work.

A public employee's speech is only constitutionally protected if it "addresses a matter of 'public concern.' " *Harris ex rel. Harris v. Pontotoc Cnty. Sch. Dist.,* 635 F.3d 685, 692 (5th Cir.2011) (quoting *Connick,* 461 U.S. at 147, 103 S.Ct. 1684).[5] If an employee does not speak as a citizen, or does not address a matter of public concern, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick,* 461 U.S. at 147. In determining whether a

---

[5] "Matters of public concern are those which can be 'fairly considered as relating to any matter of political, social, or other concern to the community.' " *Branton v. City of Dallas,* 272 F.3d 730, 739 (5th Cir.2001). Notwithstanding this principle, even when a public employee's speech relates to a topic of public interest, as is often the case in the public employment setting, it is not considered to be on a "matter of public concern" if the speaker spoke as an employee rather than as a citizen. *Harris,* 635 F.3d at 692; *see also Connick,* 461 U.S. at 147, 103 S.Ct. 1684. Speech that is purely on a matter of personal interest is spoken as an employee and is not constitutionally protected. *Benningfield v. City of Houston,* 157 F.3d 369, 375 (5th Cir.1998); *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684. However, "[t]he existence of an element of personal interest on the part of an employee in the speech does not prevent finding that the speech as a whole raises issues of public concern." *Dodds v. Childers,* 933 F.2d 271, 273 (5th Cir.1991). Speech that touches both matters of public and personal interest—so-called "mixed speech"—remains protected by the First Amendment as long as it was made "*predominantly* 'as a citizen.' " *Harris,* 635 F.3d at 692 (quoting *Dodds,* 933 F.2d at 273).

plaintiff spoke primarily as a citizen on a matter of public concern or as an employee on a matter of personal interest, a court must consider the content, form, and context of a given statement. *Connick,* 461 U.S. at 147–48; *Fiesel v. Cherry,* 294 F.3d 664, 668 (5th Cir.2002). These factors "must be considered as a whole package, and [their] significance ... will differ depending on the circumstances of the particular situation." *Moore v. City of Kilgore,* 877 F.2d 364, 370 (5th Cir.1989). The Fifth Circuit has recognized "three reliable principles" derived from its caselaw regarding whether public employee speech is made as a citizen on a matter of public concern:

> First, the content of the speech may relate to the public concern if it does not involve solely personal matters or strictly a discussion of management policies that is only interesting to the public by virtue of the manager's status as an arm of the government. If releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance, the content of the speech may be public in nature. Second, speech need not be made to the public, but it may relate to the public concern if it is made against the backdrop of public debate. And third, the speech cannot be made in furtherance of a personal employer-employee dispute if it is to relate to the public concern.

*Kennedy v. Tangipahoa Parish Library Bd. of Control,* 224 F.3d 359, 372 (5th Cir.2000) (citing cases), *abrogated on other grounds by Cuvillier v. Taylor,* 503 F.3d 397, 401 (5th Cir.2007). In accordance with these precepts, the Fifth Circuit has noted that speech regarding "internal personnel disputes and working conditions" will not ordinarily involve the public concern. *See Alexander v. Eeds,* 392 F.3d 138, 142 (5th Cir.2004) (quoting *Branton,* 272 F.3d at 739); *Petrie v. City of Grapevine,* 904 F. Supp. 2d 569, 579–80 (N.D. Tex. 2012), *aff'd sub nom. Petrie v. Salame,* 546 F. App'x 466 (5th Cir. 2013). The United States Supreme Court agrees.[6] The Supreme Court has even applied this to the Petition Clause aspect of First Amendment claims.[7]

If speech is made "pursuant to official duties," it is not constitutionally protected, no matter how great its social significance. *Garcetti v. Ceballos,* 547 U.S. 410, 421 (2006) ("[W]hen public

---

[6] It is precisely to avoid this intrusion into internal governmental affairs that the Supreme Court has held that, "while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Garcetti, supra,* at 420, (quoting *Connick,* 461 U.S., at 154). An employee grievance concerning internal office policy fails the public concern test. *Connick* at 154.

[7] *Borough of Duryea, Pa. v. Guarnieri,* 564 U.S. 379, 398–99 (2011) (The Petition Clause is not an instrument for public employees to circumvent legislative enactments when pursuing claims based on ordinary workplace grievances regardless of the context of a formal grievance. The right of a public employee under the Petition Clause is a right to participate as a citizen, through petitioning activity, in the democratic process. It is not a right to transform everyday employment disputes into matters for constitutional litigation in the federal courts. A petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context.)

employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). The Fifth Circuit has defined "pursuant to official duties" as "activities undertaken in the course of performing one's job." *Davis v. McKinney,* 518 F.3d 304, 313 (5ᵗʰ.Cir.2008). The speech need not be "required" by the job duties to fall within these parameters; rather, it is enough that the speech be "closely related" to the duties. *Id.* at 312. Whether a communication is internal or external in nature may also be significant: where "a public employee raises complaints or concerns up the chain of command at his workplace about his job duties," the speech is made pursuant to his official duties, but when an employee "take[s] his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace," these external communications are typically made as a citizen, not an employee. *Davis,* 518 F.3d at 313. Though certain factors can suggest that someone is acting pursuant to his employment responsibilities, the ultimate inquiry is whether the employee is speaking in order to further his goal as an employee or as a citizen. *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 203 (2d Cir. 2010).

By virtue of his pleadings and the evidence, it is evident that by characterizing a specific discussion he had with an engineering contractor about engineering project certifications[8] as a matter of public concern, he is attempting to make a mockery out of the well-established caselaw that the First Amendment does not empower employees to constitutionalize the employee grievance (*Garcetti v. Ceballos,* 547 U.S. 410, 420 (2006)) and that speech regarding job duties, internal personnel disputes and working conditions will not ordinarily involve the public concern. *Alexander v. Eeds,* 392 F.3d 138, 142 (5th Cir.2004) (quoting *Branton,* 272 F.3d at 739); *Petrie v. City of Grapevine*, 904 F. Supp. 2d 569, 579–80 (N.D. Tex. 2012), *aff'd sub nom. Petrie v. Salame*, 546 F. App'x 466 (5th Cir. 2013). An employee grievance concerning internal office policy fails the public concern test. *Connick v. Myers*, 461 U.S. 138, 154 (1983).

Plaintiff's alleged "speech" did not involve a matter of public concern and was not as a private citizen, but instead involved specific conversations and actions/inactions totally within his job duties as an employee of the City as City Engineer. The alleged speech in this case would clearly and unquestionably be within his job duties as the City Engineer. Reviewing/approving/not approving/disagreeing with/signing off on etc., engineering plans for specific City engineering

---

[8] One in which he later simply "makes up" the certifications he was being asked to sign.

project is without a doubt the most key component of a City engineer's job description. *Ex. 1, p. 25:5-16; p. 26:12-25; p. 33:11-34:6 with depo Ex. 1.* Plaintiff's position as City Engineer had a written job description, which Plaintiff agrees with contains his job requirements and duties. *Id*. These duties necessarily included assisting contract engineers with their work on engineering projects, to include assisting contract engineers on the project; signing off on documents related to the project, to include utility conflicts that needed to be signed by the City Engineer; assisting and coordinating with contract engineers on utility relocation for the project; signing and submitting to TexDot any necessary forms or documents indicating that utility conflicts still existed on the project; and signing and submitting utilities and rights of way certifications to TexDot on the project. *Ex. 1, p. 21:4-16; p. 52:1-5; p. 80:1-84:16 p. 85:17-p. 86:16; p. 118:1-p. 121:15; p. 141:1-16; p. 143:4-16; with depo Ex. 1, 6, 11.* Most importantly, Plaintiff's job duties included overseeing all engineering design and construction activities involving the City and other agencies. *Ex. 1, 25:5-16; p. 26:12-25; p. 33:11-34:6 with depo Ex. 1.* This unquestionably and necessarily includes reviewing engineering project certifications for accuracy; commenting on their accuracy; submitting or advising not to submit certifications for engineering projects based on their accuracy or lack of accuracy; making revisions to certifications or other engineering documents; and making decisions about what engineering project-related documents get submitted to necessary agencies and when.

Thus Plaintiff's "speech" (allegedly refusing to sign a specific certification that he invented in his head he was being asked to sign) was not at all a matter of public concern: as it was both inextricably tied up in his job duties; and because he could have simply signed and submitted alternative accurate certifications totally acceptable to TexDot. His "speech" claim is based on the fact that Plaintiff was apparently either totally mistaken about what types of "certifications" he needed to/were available to sign and submit to TexDot on this project; and/or he simply refused to do his job in proposing and signing and submitting alternative accurate documentation to TexDot. Thus Plaintiff's entire claim is based on either 1.) the mistaken belief he was asked and/or ordered by a contractor(not a city employee) to sign and submit a specific certification form on a specific date and he was unaware of alternative certifications he could sign in lieu; or 2.) he knew he had alternatives, but refused to do his job and instead pretended those alternatives didn't exist or clarify that issue with *anyone*, and instead simply make up totally unrelated forms in his head to present to the City that he was being asked to sign. The evidence is unmistakable that this is what occurred.

Plaintiff didn't engage in First Amendment "speech" by refusing to sign inaccurate certifications; instead he "invented in his head" forms that would be inaccurate; misrepresented/misunderstood that these "invented forms" were what he was being ordered to sign; and decided he wouldn't sign these fictional forms.

To understand the audacity of this entire claim, Plaintiff's alleged "speech" at this September 16 meeting with Torres must be closely examined. He claims that the speech was refusing to sign specific certifications that would inaccurately state all utility conflicts were cleared when they were not; and that all rights of way were obtained by the City, when they were not. He claims that the refusal to sign such specific certifications was done in response to a request from City consulting engineer Joe Torres at that meeting; and subsequently Assistant City Manager Wylie on the following Monday, September 19 when Wylie simply told him "we need to get this project moving". [9]

First, signing certifications, including those identifying all utilities had been cleared and rights of way obtained would be the City Engineer's job; and would need to be done eventually on the project once those items were completed. Plaintiff testified that consultant Joe Torres never gave him a time-frame to sign and submit the document(s); and he fully acknowledged it was *his job* to sign and submit such certifications. *Ex. 1, p. 140:9-141:16; p. 143:11-16.* Additionally, at this September 16 meeting, Plaintiff testified that Joe Torres did not present him any specific forms/certifications that needed to be signed, confirmed by the TexDot representative who indicated there were no documents or certifications at the meeting. *Ex. 1, p. 150:22-151:7; Saldivar, p. 115:10-12; p. 116:16-p. 117:7.* So according to Plaintiff, all Joe Torres did was tell Plaintiff he would have to do something (sign these final certifications), with no specific deadline, that Plaintiff fully acknowledges was part of his job and would eventually have to be done. Refusing to sign certain certifications, at that exact moment, that he was not asked to sign at that moment, and which were not presented to him for singing at that moment, does not constitute a matter of public concern. He was simply being told to do his job; something he refused to do.

Instead Plaintiff tries to make it into a public concern and seem far more nefarious, by simply reading into the allegations, that he was asked/ordered to, and subsequently refused, to sign inaccurate certifications on utilities and rights of way, at that exact moment, stating those projects

---

[9] His complaint also states he was ordered to sign these certifications by City Manager Guerra, but he walked back that allegation completely in his testimony.

were complete when they were not yet complete. However, his own testimony and evidence do not establish such demands/requests were ever made. In other words, *he "refused" something that was never asked of him*. That is not First Amendment speech.

Secondly, since the TexDot representative present at this September 16 meeting did not specify which certification(s) needed to be submitted (ie ones that specifically say all utilities have been cleared and rights of ways obtained) *Ex. 2, p. 131:18-p. 133:7); and* because alternative certifications forms existed that TexDot explicitly told plaintiff would be acceptable (certifications identifying utility and right of way *conflicts still existed*), Plaintiff's blanket refusal to sign the specific certifications that were *not required* does not constitute a matter of public concern. If his testimony is too be believed, Plaintiff essentially had two alternatives available: sign a certification that he believed contained inaccuracies and he wouldn't sign; or sign a certification that would be acceptable and had no inaccuracies. If Plaintiff's testimony is taken as fact, rather than do his job and ask about; confirm and sign the alternative accurate certifications, Plaintiff simply refused to sign one set of certifications; walked away and claimed First Amendment conduct. This despite the fact that city engineer Torres never asked him to sign and submit the alleged inaccurate certifications *at that exact time*; and despite the fact that he had perfectly legal and legitimate alternative accurate certifications to sign and submit.[10]

In reality, had Plaintiff read his emails; inquired into the actual documentation needed to be submitted; and even had a remotely basic understanding of TexDot certification requirements in engineering projects, he would have realized he could have simply submitted accurate right-of-way and utility certifications, certifying that not all rights of way had yet been obtained and there were still utilities in conflict. This entire lawsuit is based on Plaintiff's mistaken belief, or knowingly disingenuous position, that only one certification form existed for these issues at that time-a form certifying that all utilities had been relocated and that all rights of way had been obtained.

It is factually undisputed that a week prior to the September 16 meeting, TexDot notified Plaintiff that a number of acceptable certification forms existed, to cover all possibilities, including the situation that utilities were still in conflict and rights of way were still not obtained or were outstanding(which according to Plaintiff was the situation as of September 16); and Plaintiff saw and read the email with the attached various certifications. *Ex. 1, p. 128:2-20; p. 129:8-with depo*

---

[10] Which the City ultimately had to and did submit with no problems whatsoever.

*Ex. 12*. He chose to ignore it. *Ex. 1, p. 128:2-20; p. 129:8-p. 132:13; p. 156:23-p. 158:13 with depo Ex. 12*. In response to this email, Plaintiff did nothing and the email itself didn't trigger anything in his mind that something had to be done even though submitting the documents/certifications was his job. *Ex. 1, p. 156:23-p. 158:13*. It is factually undisputed that TexDot notified Plaintiff and Torres that it accepts these alternative certifications in situations where utilities are not yet cleared and/or rights of way are not yet obtained and Plaintiff ignored it. *Ex. 3, p. 21:6-p. 26:2*; *p. 26:23- p. 34:21 with depo Ex. 3*. Ignoring this; and lacking an understanding of this, led to the chain of events of Plaintiff misunderstanding what was being asked of him; not appreciating and understanding his job; not appreciating and not understanding alternative options to "First Amendment refusal speech."

Had Plaintiff properly read the email; and been even remotely competent at his job, he would have known that there was not a single situational certification form to be filed at that time, but instead alternative forms to cover the specific situation(s) Plaintiff claims existed (rights of way not all obtained; utilities still in conflict). An essential part of his job was to identify the inaccuracies and inability to sign certifications containing inaccuracies on the current state of rights of way and utilities; identify what alternative certifications could be submitted at that time which would be accurate; and then make arrangements to prepare; sign and submit such certifications. Instead, Plaintiff apparently simply complained about signing one type of certification; walked away; talked to nobody to clarify; and then went in and totally misrepresented to the Assistant City Manager on the following Monday that he was being asked to sign a specific certification that nobody ever showed him or demanded he sign, much less that TexDot ever sent him. The evidence is factually indisputable that he simply "made up" a certification language he was being asked to sign. That's his claimed First Amendment speech

Plaintiff's entire lawsuit about his refusal to sign inaccurate certifications is based on an improper and incorrect assumption he developed (later contradicted by his own testimony and emails) that the only certifications that existed would be one that necessarily would have to be inaccurate. Plaintiff fully acknowledged that he had no idea if utility and right-of-way documents could be submitted indicating that those were not yet completed. *Ex. 1, p. 92:15-93:9*. Plaintiff also testified that there is no certification form indicating that utilities are still in conflict and that in his entire engineering career, he never saw such a certification or form. *Ex. 1, p. 101:4-p. 102:24*. Continuing his lack of basic understanding of TexDot required documentation, Plaintiff testified

Defendant City's Motion for Summary Judgment                                    Page 19

he's never submitted a certificate of utilities conflict; never submitted any documentation to TexDot advising of ongoing utilities conflicts; and had never even heard of anyone submitting documentation to TexDot advising of ongoing utilities conflicts. *Ex. 1, p. 115:18-117:15*. Had he read the email from TexDot; or made even a basic inquiry, he would have known his only option wasn't to sign an "inaccurate" certification, but a certification that accurately depicted the circumstances. He simply did not do his job.

To state that not signing proposed engineering project certifications is not one of his duties because his job description doesn't include "signing inaccurate plans" would essentially shirk his duties entirely. Pointing out that engineering documents are inaccurate; asking that they be corrected; or simply preparing and signing correct alternative documents to further an engineering project is without a doubt in the City engineer's job duties as detailed above. Instead of simply refusing to sign non-required inaccurate certifications, Plaintiff could have simply done his job and sign and certify the certifications allowed by TexDot; including the certification forms Plaintiff himself said he knew alternatively could be submitted to TexDot indicating that there were ongoing utility conflicts not yet cleared and estimating their clearance dates.

Plaintiff now draws a distinction between these forms with semantics, saying that these acceptable accurate forms aren't "certifications". *Ex. 1, p. 118:1-125:12 with depo Ex. 11*. It is these frivolous semantics distinctions which in essence form the entire basis of his lawsuit. TexDot certainly draws no such distinctions; and specifically sent these alternate certification forms to Plaintiff by email with comment they could be submitted. Plaintiff apparently chose to ignore and not ask questions or do his job in the least. This despite Plaintiff fully acknowledging that it would be his job as City Engineer to sign and submit documentation to TexDot indicating that utility conflicts were not yet clear and identifying the still existing utility conflicts. *Ex. 1, p. 121:2-15*. In fact, Plaintiff did know he had alternatives available, as he specifically sent the various TexDot accepted certifications(Plaintiff even calls them certifications) to Wylie on September 19. *Ex. 13*. He knew these certifications existed; he knew they were an option to be signed and submitted; and he even notified his City supervisors he could sign them. In reality he simply failed to do his job; and claims that this failure to do his job somehow constitutes First Amendment speech. He should not be allowed to benefit from a failure to do his job and a failure to have even a basic understanding of required and acceptable documentation on engineering projects for which he was the engineer in charge.

**2. Plaintiff's alleged "speech" not matter of public concern/does not meet efficiency test**

Dovetailing with the above, the competent summary judgment evidence establishes that Plaintiff's alleged "protected speech" at this September 16 meeting (or the meeting on September 19 with Ed Wylie) did not outweigh the City's interest in promoting efficiency on the Owassa Road project. Even if an employee does speak as a citizen on a matter of public concern, the employee's speech is not automatically privileged; Courts balance the First Amendment interest of the employee against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." This framework "reconcile[s] the employee's right to engage in speech and the government employer's right to protect its own legitimate interests in performing its mission." *San Diego v. Roe,* 543 U.S. 77, 82 (2004) *(per curiam).*[11]

As shown above, even if Plaintiff was actually told to sign a specific inaccurate certification regarding utilities and rights of way by consulting engineer Torres, any reasonable engineer/employee in that situation would have confirmed what was being asked of him; confirmed the alternative options available; and proceeded with the alternative options that did not contain inaccuracies; or at the very least notified his employment supervisors of the perfectly accurate and legitimate alternatives that would keep the project moving. Failing to do this constitutes a complete failure of Plaintiff to show that his "speech" outweighed the City's interest in promoting the efficiency of the project.

The evidence shows that Plaintiff simply walked away from the meeting with Torres on September 16 with him refusing to or attempting to clarify the alternative certifications that could be submitted; refusing to notify fellow consulting engineer TEDSI of the inaccurate certification/alternate certification issue; and refusing to notify anyone at the City or TexDot of the situation because it "was at the end of the day" and he was ready to start his weekend. *See above evidentiary cites.* But this "refusal"/speech did not in the least outweigh the city's interest in efficiency; and that was perhaps most evident with Plaintiff's conversation with Wylie on

---

[11] A citizen who accepts public employment "must accept certain limitations on his or her freedom." *Garcetti,* 547 U.S. at 418. The government has a substantial interest in ensuring that all of its operations are efficient and effective. That interest may require broad authority to supervise the conduct of public employees. "When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her." *Waters v. Churchill,* 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion).

Monday September 19. According to Plaintiff, all Defendant Wylie told Plaintiff in regards to the project is that we have to get it moving. He was never asked; ordered; nor instructed by Wylie to sign any specific certifications. *See above evidentiary cites* What did Plaintiff do at that moment? According to him he read to Wylie, selected portions from totally unrelated documents he printed off the internet which were not even included in the documents TexDot advised they needed(and that *themselves* actually allowed for alternative certification statement that rights of way were not yet done if he had bothered to read that part of it). Futher, he actually sent an email to Wylie not saying a single thing about an alleged order or instruction to sign inaccurate certifications, but instead attaching TexDot certifications that he could have signed and submitted to TexDot which would have allowed for an accurate identification of still unresolved utility conflicts.

Rather than do his job and sign and certify accurate and acceptable alternative certifications that TexDot would accept, Plaintiff instead printed out and brought in to read to Wylie certifications that TexDot itself never sent to Plaintiff; nor ever told anyone at the City were required; and simply refused to sign *any* certifications-even accurate ones-even though it was admittedly his job. He failed to even tell Wylie something very simple along the lines of "I can instead simply sign and submit these certifications identifying conflicts still in existence". It would have been that simple. That would have met the efficiency balancing test.   He didn't do that. The real reason Plaintiff refused to sign certifications, as shown in the summary judgment evidence, is that he simply didn't think it was his job. It wasn't about the accuracy or inaccuracy of specific certifications. Plaintiff simply didn't want to sign certifications-period. This is hardly promoting efficiency. This is hardly engaging in First Amendment speech. Plaintiff's claims fail as a matter of law.

## B.    Plaintiff Cannot Show alleged First Amendment activity was causal to his employment separation

Despite the fact that Plaintiff's allegations of "speech" cannot even form the basis for a First Amendment claim in that they are not matters of public concern and did not outweigh the City's interest   in promoting efficiency, Plaintiff further cannot as a matter of law show that his employment separation was based on/substantially motivated by First Amendment retaliation.

The competent summary judgment evidence establishes that Plaintiff's employment was separated for legitimate non-First Amendment reasons. The competent summary judgment evidence establishes that Plaintiff was never ordered, instructed, asked or directed to sign

inaccurate or false certifications by anyone employed by the City of Pharr. *See above evidence citations*. The competent summary judgment evidence establishes that Plaintiff never even provided or brought to the attention of his employment decision-maker Guerra, any actual First Amendment speech in the form of a refusal to sign actual inaccurate certifications or documents insisted on by Torres. *Id*. The competent summary judgment evidence establishes that Plaintiff's alleged refusal to sign inaccurate certifications was not even an issue with respect to his employment termination. *Ex. 1-2; 4; 6-7; 11*. It wasn't considered (or even know about-if it existed at all) in the recommendation for termination. *Id*. It wasn't considered (or even know about-if it existed at all) in the ultimate employment decision to separate his employment. *Id*. City Manager Defendant Guerra made the decision to separate Plaintiff's employment and the competent summary judgment evidence shows that it was based solely on non-First Amendment-related reasons and documentation provided with a recommendation from Assistant City Manager Wylie. *Ex. 2; 4; 6-7*. As shown by the evidence, an alleged refusal to sign inaccurate certifications (as opposed to a general issue of not signing certifications) is not mentioned; discussed; brought up; or considered in any of the termination documents reviewed by and considered by Guerra. Further, Plaintiff himself admittedly never discussed this with Guerra.

As such, the only evidence in the summary judgment record directly bearing on the actions or inactions of the City, through Assistant City Manager Wylie and City Manager Guerra, in regards to Plaintiff's employment, establish that his employment was separated for job performance related reasons, not First Amendment conduct. There is no contradicting evidence to create a fact issue on this. The competent summary judgment evidence shows that Plaintiff's employment separation was not based on any First Amendment considerations, but was based solely on legitimate, First Amendment-neutral job performance issues. For this reason Plaintiff's claim fails as a matter of law.

## C. Plaintiff cannot show Defendant violated his First Amendment rights as a matter of law under the *Monell* requirements

Defendant would further note that Plaintiff does not plead and cannot establish as a matter of law, a Section 1983 claim against the City for violation of his First Amendment rights. A municipality is a "person" subject to suit under Section 1983. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). To state a claim for municipal liability Section 1983, a plaintiff must establish three elements: "a policymaker; an official policy; and a violation of

constitutional rights whose moving force is the policy or custom." *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694). "The elements of the *Monell* test exist to prevent a collapse of the municipal liability inquiry into a *respondeat superior* analysis." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 167 (5th Cir. 2010) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown,* 520 U.S. 397, 415 (1997)). "A municipality may not be subject to liability merely for employing a tortfeasor." *Id.*

"The first requirement for imposing municipal liability is proof that an official policymaker with actual or constructive knowledge of the constitutional violation acted on behalf of the municipality." *Id.* at 167 (citing *Cox v. City of Dallas, Tex.,* 430 F.3d 734, 748–49 (5th Cir. 2005)). Upon finding a policymaker, a court must "consider whether the allegedly unconstitutional action constitutes a "custom or policy" of the municipality." *Id.* at 168. Courts have identified two forms that "official policy" may take. "First, a plaintiff may point to a policy statement formally announced by an official policymaker." *Id.* at 168 (quoting *Webster,* 735 F.2d at 841). In the alternative, the plaintiff may demonstrate a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Id.* at 169. To render a city liable actual or constructive knowledge of a 'custom' must be attributable to the governing body or officials to whom that body has delegated policy-making authority." *Webster v. City of Houston*, 735 F.2d at 841; *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002).

Finally, to satisfy the third requirement, a plaintiff must allege "'moving force' causation." *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010). This is a two-part obligation. A plaintiff must show "that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id*. Additionally, a "plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id*.

Plaintiff cannot meet this test as a matter of law. Plaintiff has not identified a policy-maker for purposes of his First Amendment claim. Plaintiff will no doubt purport to identify City Manager/co-Defendant Guerra as an official policy-maker for the City, as the man who terminated him. Defendant does not dispute that for purposes of employment separation, Guerra, as the City

Manager, would be a policy-maker for the City. However, this is the only element Plaintiff can satisfy as a matter of law with respect to the *Monell* analysis. Plaintiff cannot show as a matter of law that his employment separation as undertaken by Guerra, was done pursuant to a policy or custom of First Amendment-speech rights violation; that any "policy, practice or custom" of First Amendment speech rights violation was the "moving force" behind his employment separation; that there was any policy statement announced by any City policy-maker of First Amendment speech rights violation; that his employment separation was done pursuant to an unofficial custom or practice of such constitutional rights violations; or that Guerra acted with deliberate indifference to the risk of a violation of Plaintiff's constitutional rights of free speech.

There exists no evidence of any policy statement formally announced by anyone at the City regarding retaliating against employees for First Amendment speech. Further, there is no evidence to show that Guerra/the City acted persistent to a widespread practice or custom of city officials or employees of First Amendment speech employment retaliation such that it that fairly represents municipal policy. Plaintiff cannot create a material issue of fact that his employment termination was pursuant to a pattern, practice or custom of First Amendment-speech retaliation.[12]

Plaintiff has no evidence to establish a pattern, practice or custom of First Amendment speech retaliation. When asked to identify the evidentiary basis for this and to identify any other employees fired for engaging in First Amendment speech, Plaintiff had no names or employees. *Ex. 1, p. 216:22-p. 217:11*. His actual Complaint fares little better in this regard. *See Dkt. 18* [13] As such, Plaintiff has absolutely no evidence in support of a pattern, practice or custom of First Amendment retaliation by the City. In fact, the competent summary judgment evidence outlined and identified above in fact defeats Plaintiff's *Monell* claim as a matter of law with respect to each

---

[12] A plaintiff can allege the existence of a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010) (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)). "A customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Id.* Such "[a] pattern is tantamount to official policy." *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009).

[13] Plaintiff identifies Dolly Ybarra and Heriberto De Leon as individuals who have been the victims of this policy*." Dkt. 18, ¶24*. Plaintiff merely "identifies" these two alleged employees who are the victims of this "policy", failing to identify any time-frames; any background facts regarding how they constitute part of a pattern of First Amendment retaliation/ie how they were the victim of First Amendment retaliation; whether these other two employees were in fact even the victims of First Amendment retaliation and how. Further, and perhaps most importantly, Defendants' counsel would note that Plaintiff's counsel has represented, in lawsuits, both Ms. Ybarra and Mr. De Leon against the City, making absolutely no allegations of First Amendment-speech retaliation in any of them. *Ex. 14*.

of the requisite elements. Defendant Guerra did not and could not have acted with deliberate indifference to Plaintiff's First Amendment rights, when there isn't a shred of evidence to suggest he considered (or even knew about) Plaintiff's alleged First Amendment speech in terminating him. The competent summary judgment evidence shows there was no deliberate indifference on his part. For these reasons the claim should be dismissed as a matter of law on this basis.

## IV.
## CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants would request that the Court grant this Motion for Summary Judgment and dismiss Plaintiff's claims identified above pursuant to FRCP 56. Defendant further requests such other and further relief to which they may show themselves to be justly entitled, at law and in equity.

SIGNED this 6th day of March, 2020.

Respectfully submitted,

By:   *Ricardo J. Navarro*
      RICARDO J. NAVARRO
      State Bar No. 14829100
      So. Dist Id No. 5953
      rjnavarro@rampage-rgv.com
      **DENTON NAVARRO ROCHA**
      **BERNAL & ZECH**
      A Professional Corporation
      701 E. Harrison Ste 100
      Harlingen, Texas 78550
      956/421-4904
      956/421-3621 (fax)

By:     *Robert L. Drinkard*

ROBERT L. DRINKARD
State Bar No. 24007128
So. Dist Id No. 23712
rdrinkard@rampage-rgv.com
**DENTON NAVARRO ROCHA
BERNAL & ZECH**
A Professional Corporation
701 E. Harrison Ste. 100
Harlingen, Texas 78550
956/421-4904
956/421-3621 (fax)

**COUNSEL FOR DEFENDANTS
CITY OF PHARR, GUERRA AND
WYLIE INDIVIDUALLY**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document has been served on the persons or parties identified below in accordance with one or more of the recognized methods of service by the Federal Rules of Civil Procedure on the 6th day of March, 2020.

Katie P. Klein                                                        **By E-Filing Methods**
DALE & KLEIN, LLP
1100 E. Jasmine Ave., Ste 202
McAllen, Texas 78501
**Attorney for Plaintiff**

*Robert L. Drinkard*

RICARDO J. NAVARRO
ROBERT L. DRINKARD

Defendant City's Motion for Summary Judgment                                   Page 27